## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION,** | |
| **Plaintiff,** | **Case No.** |
| **v.** | |
| **NAUFAL SANAULLAH,** | **JURY TRIAL DEMANDED** |
| **Defendant** | |

## COMPLAINT

Plaintiff United States Securities and Exchange Commission ("SEC"), for its Complaint against defendant Naufal Sanaullah ("Sanaullah") alleges as follows:

## INTRODUCTION

1.      Sanaullah, the Chief Macro Strategist and Chief Risk Officer of a private fund, made and disseminated false and misleading statements to the fund's investors and prospective investors concerning the fund's risk management practices (claiming the fund had controls in place it followed; it did not) and his educational background (claiming to have graduated from the University of Michigan; he did not).

2.      From at least mid-2017 through May 2022, EIA All Weather Alpha Fund I Partners, LLC ("EIA") has been the investment adviser and general partner to the EIA All Weather Alpha Fund I, LP (the "Fund"). EIA solicited and raised approximately $39 million from over 100 investors for the Fund. On May 18, 2022, the SEC filed an *ex parte* emergency civil injunctive action against EIA and Andrew M. Middlebrooks, EIA's owner and CEO, to stop an on-going offering fraud. *See SEC v. Middlebrooks, et. al.*, No. 2:22-cv-11073 (E.D. Mich. May 18, 2022) (the "SEC 2022 Complaint").

3.      The SEC brings this Complaint against Sanaullah for his role at EIA. From at least December 2017 through October 2021 (the "Relevant Period"), Sanaullah solicited Fund investors and prospective investors. During this period, he made false and misleading statements to them concerning the Fund's risk management practices. Sanaullah made these statements on phone calls and video calls, and in emails.

4.      Additionally, Sanaullah disseminated, or directed others at EIA to disseminate, to investors and prospective investors false and misleading information concerning the Fund's risk management practices and his educational background.

5.      During the Relevant Period, Sanaullah knew that the represented risk control protocols of the Fund were not being followed and that he never graduated college.

6.      By engaging in this conduct, Sanaullah violated Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a), Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5. Unless restrained and enjoined, Defendant will continue to violate the federal securities laws.

7.      The SEC seeks, among other things, a permanent injunction, disgorgement of ill-gotten gains from the unlawful activity set forth in this Complaint, together with prejudgment interest, and a civil penalty pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d) and Section 21(d)(3) of the Exchange Act, 15 U.S.C. §78u(d)(3). The SEC also seeks an order barring Sanaullah from serving as an officer or director of a public company pursuant to Section 20(e) of the Securities Act, 15 U.S.C. 77t(e) and Section 21(d)(2) of the Exchange Act, 15 U.S.C. 78u(d)(2).

## DEFENDANT

8.      **Naufal B. Sanaullah** ("Sanaullah"), age 34, is a resident of Sylvania, Ohio and, during the Relevant Period, served as EIA's Chief Macro Strategist and Chief Risk Officer.

3

## OTHER RELEVANT INDIVIDUAL AND ENTITIES

9. **Andrew M. Middlebrooks** ("Middlebrooks"), age 32, was the Chief Executive Officer ("CEO") and Chief Investment Officer ("CIO") of EIA. Middlebrooks owned and controlled EIA. On May 16, 2022, the SEC charged Middlebrooks in the SEC 2022 Complaint. In October 2022, Middlebrooks was criminally charged with one count of wire fraud and pled guilty to an Information filed in the United States District Court for the Eastern District of Michigan. *USA v. Andrew H. Middlebrooks,* No. 2:22-cr-20516 (E.D. Mich. October 11, 2022).

10. **EIA All Weather Alpha Fund I Partners, LLC** ("EIA"), is a Delaware limited liability company formed on or about June 12, 2017, with its principal place of business in Novi, Michigan. EIA is the investment adviser and general partner of the Fund. EIA has also conducted business under the names "EIA All Weather Alpha Partners," "EIA All Weather Alpha Partners, LLC," "EIA Alpha Partners Fund Management," and "Excellence In Investing In Action Alpha Partners Fund Management LLC." The term "EIA" incorporates these additional names under which EIA acted or purported to act. EIA is not registered with the SEC or any state as an investment adviser. EIA was charged by the SEC in the SEC 2022 Complaint, as described above.

11. **EIA All Weather Alpha Fund I, LP** ("the Fund"), is a Delaware limited partnership, formed on or about June 13, 2017. It is a pooled investment

4

vehicle that has sold limited partnership interests to investors. The Fund's assets are managed by EIA, which also serves as its general partner. EIA has also referred to the Fund as "Excellence in Action (EIA) All Weather Alpha Fund I, LP," "EIA All Weather Alpha Fund," and "EIA All Weather Alpha Partners Fund I, LP" in various Fund documents and marketing materials. The term the "Fund" incorporates these additional names under which the Fund acted or purported to act. The Fund is named as a relief defendant in the SEC 2022 Complaint.

## JURISDICTION AND VENUE

12.    The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1), and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d)(1), and 77v(a), and Sections 21(d) and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d) and 78aa.

13.    The Court has personal jurisdiction over Sanaullah and venue is proper in this judicial district, because many of the acts and transactions constituting violations of the Securities Act and Exchange Act occurred in this district. In addition, from at least mid-2017 through February 2020 EIA and the Fund had principal places of business in this district and one or more investors in the Fund reside in this district.

14.    In connection with the conduct alleged in this Complaint, Sanaullah, directly or indirectly, singly or in concert with others, made use of the means or

instrumentalities of interstate commerce, the means and instruments of transportation or communication in interstate commerce, or the mails, including soliciting investors located in other states and obtaining funds from those investors through wire transfers in interstate commerce.

## FACTS

**I.     FACTS**

### A.     EIA, the Fund, and Middlebrooks

15.     Middlebrooks formed EIA and the Fund in June 2017.

16.     Middlebrooks and EIA marketed the Fund as a "quantitative relative value fund" and a "quantitative long/short equity fund which exploits inefficiencies in the global equity market to achieve attractive absolute returns."

17.     EIA served as the Fund's general partner and investment adviser and Middlebrooks managed the Fund's portfolio and operations on behalf of EIA.

18.     Each investor in the Fund was offered and sold a limited partnership interest in the Fund.

19.     The limited partnership interests in the Fund are securities as defined in Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act. Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act define "security" to include, among other things, "investment contracts." The limited partnership interests in the Fund were investment contracts.

20.     From at least May 2017 through April 2022, EIA raised approximately $39 million from over 100 investors located across the country. Investors typically made their investments in the Fund by executing wire transfers from their financial institutions to EIA's bank account.

**B.     Sanaullah's Role at EIA**

21.     Middlebrooks hired Sanaullah at EIA in mid-2017. Prior to beginning work at EIA, Sanaullah attended various colleges, including the University of Michigan.

22.     Sanaullah had not received a college degree at the time he was hired by EIA and did not receive a college degree at any time while working at EIA.

23.     During the Relevant Period, Sanaullah was EIA's Chief Macro Strategist and Chief Risk Officer.

24.     Sanaullah was held out as a "partner" of EIA to investors.

25.     During the Relevant Period, Sanaullah's job duties included, among other things, providing oversight of the Fund's risk management protocols, soliciting prospective investors, preparing and reviewing written Fund documents, doing media appearances, and performing macroeconomic analysis.

26.     Sanaullah participated in drafting and reviewing Fund documents, including investor presentations, performance sheets, and a due diligence questionnaire, that were provided to prospective investors.

a.  The investor presentations were updated quarterly and provided to prospective investors. Among other things, the investor presentations set forth the Fund's risk management protocols and stated Sanaullah graduated college. Sanaullah participated in drafting and reviewed the risk management protocol portions and Sanaullah's education portion of the investor presentations. Sanaullah also disseminated these documents to prospective investors.

b.  The performance sheets were updated monthly and provided to prospective investors. Among other things, the performance sheets stated that Sanaullah graduated college. Sanaullah participated in drafting and reviewed the statements concerning his college degree in the performance documents. Sanaullah also disseminated these documents to prospective investors.

c.  The due diligence questionnaire was drafted in 2019 and provided to certain prospective investors. Among other things, the due diligence questionnaire discussed the Fund's risk management protocols and stated Sanaullah graduated college. Sanaullah participated in drafting and reviewed the risk management protocols and education portion of the due diligence questionnaire. Sanaullah also disseminated this document to prospective investors.

27.     Sanaullah had access to at least a portion of the Fund's accounts and Sanaullah traded in at least some of the Fund accounts.

28.     From August 2019 through August 2021, Sanaullah received $553,000 from EIA as compensation.

29.     Sanaullah resigned from EIA in October 2021.

30.     At the time Sanaullah resigned from EIA in October 2021, the Fund had received over $34 million in investments from more than 100 investors.

**C.     Sanaullah Made False and Misleading Statements to Investors About the Fund's Risk Management Protocols.**

31.     During the Relevant Period, Sanaullah solicited new investors for the Fund and encouraged current Fund investors to invest additional money.

32.     Sanaullah communicated with prospective and current investors by email, phone, and Zoom video calls.

33.     During the Relevant Period, Sanaullah told investors that he was the Chief Risk Officer and he was responsible for the Fund's overall portfolio risk and construction.

34.     During the Relevant Period, Sanaullah made false and misleading statements directly to investors on phone and Zoom calls concerning the Fund's risk protocols.

    a.  Sanaullah told investors the Fund adhered to risk management protocols.

9

    b.   Sanaullah told investors how the risk management protocols were implemented in the Fund's overall portfolio.

    c.   Sanaullah told investors that if the Fund lost 10 or 20 percent of value in a week, positions would be liquidated to protect the Fund.

35.    For example:

    a.   In January 2020, a prospective investor emailed Sanaullah after a call and stated: "Thank you for taking the time this morning to speak with us. I figured your returns would be solid but did not expect this. Congratulations on the great start." The investor had at least seven follow-up calls with Sanaullah. On these calls Sanaullah represented, among other things, that the Fund had robust risk management systems. The prospective investor invested in the Fund.

    b.   In November 2020, Sanaullah directed an EIA employee to send a potential investor and his son the October 2020 performance sheet. Sanaullah had several email exchanges and Zoom calls with the investor and his son over the following months discussing, among other things, the Fund's risk management safeguards. The prospective investor invested in the Fund.

36.    In addition to his verbal representations, during the Relevant Period Sanaullah also made false and misleading statements about the Fund's risk

management protocols to investors and prospective investors in emails he wrote and sent.

    a.   On July 25, 2019, Sanaullah sent a prospective investor an email answering due diligence questions, telling the prospective investor that they [he and Middlebrooks] had updated the answers, reviewed them, and believed they "got everything." The due diligence questionnaire answers in the email stated, in part: "We do have stop orders always in the book," and that Middlebrooks and Sanaullah conduct a weekly review of trading where "[w]e reconcile our trade log with our positions, as well as make sure available margin is reconciled with our internal models."

    b.   On January 27, 2020, Sanaullah emailed a prospective investor, stating in part: "As a reminder, we are a hedge fund management company that is involved in global long/short investing and global macro trading.  We strive to be able to provide excess returns across disparate market environments, which is why we use an "all-weather" and global approach to risk-taking, a proprietary analytics engine (called GLM Analytics) for long/short equities that is calibrated differently for different sectors and regions, and a stringent, macro-influenced approach to portfolio construction and risk management."

Sanaullah also provided this wording to another EIA employee to be used as a template to send to prospective investors, with Middlebrooks, Sanaullah, and the other employee's name in the signature.

37.     A reasonable investor would have understood from these verbal and written statements that the Fund had risk management protocols that were being implemented and that Sanaullah monitored and controlled the Fund's risk.

38.     These verbal and written statements to investors and prospective investors about the Fund's risk management protocols were false and misleading when made because the Fund was not following the risk management protocols that had been represented to investors and Sanaullah was not ensuring the risk management protocols were being followed.

39.     Sanaullah's statements to investors and prospective investors about the Fund's risk management protocols were false and misleading when made and Sanaullah knew or was reckless in not knowing, and should have known, that the statements were false and misleading. Sanaullah did not always follow the risk management protocols in his trading for the Fund and from his access to certain trading accounts Sanaullah could see that Middlebrooks was not following the risk protocols represented to investors.

40.     While working at EIA, Sanaullah was in daily contact with Middlebrooks and the two generated numerous WhatsApp and other text message application threads discussing in real time the Fund's activity, the Fund's risk management practices, and the Fund's failure to follow the risk management protocols.

41.     Sanaullah repeatedly discussed in his chats with Middlebrooks in 2019 that he was aware of the Fund's failure to follow any risk management protocols.

   a.  On April 3, 2019, Sanaullah wrote to Middlebrooks: (1) "We can't do this anymore dude! We just cannot trade without quantifying risks. Not any longer. Both of us have fucked this up too many times.;" (2) "I don't care if we lose money, I care if we are reckless with no risk mgmt. Yesterday you did not show any risk mgmt."

   b.  On April 5, 2019, Sanaullah wrote to Middlebrooks "There's never been any risk mgmt. Bc u wanna size everything all the way up always no matter what. The dumbest fucking thing you've done has been trying to be a heavy every single day since Jan 2018 [.] You need to realize you hired me and now I have to lie everyday we speak to ppl … I feel like a fucking fraud."

c. On May 15, 2019, Sanaullah wrote to Middlebrooks: (1) "I've told u for almost two years now. I don't know how to trade like this. With no margin, no ability to manage risk."; (2) "Things will get very very very fucking bad if don't utterly crush it. It is absolutely irresponsible to just assume we will if we work hard enough. It's utter nonsense. The opposite of thinking about risk management."

42.     Sanaullah's false and misleading statements made to Fund investors and prospective investors concerning the Fund's risk management practices were material because they touch upon one of the most fundamental aspects of the investment, risk analysis, management, and controls. Investors and prospective investors would want to know if the Fund was failing to provide risk management of the Fund's trading decisions and if risk management protocols were not being monitored or deployed as disclosed.

**D.      Sanaullah Engaged in Additional Conduct to Mislead Investors about the Fund's Risk Management Protocols and his Education.**

1.     <u>Sanaullah Disseminated Materials with False and Misleading Statements to Investors About the Fund's Risk Management Protocols.</u>

43.     During the Relevant Period, in addition to the material misrepresentations concerning the Fund's risk management protocols verbally told to investors and written in his emails, Sanaullah also participated in drafting and

reviewing, as well as disseminating, documents with false and misleading statements concerning the Fund's risk management protocols.

    a. During the Relevant Period, Sanaullah participated in drafting and reviewing the quarterly investor presentations, which discussed the Fund's risk management protocols, and were distributed to investors and prospective investors. For instance, the December 31, 2017 investor presentation listed Sanaullah as the Chief Macro Strategist, and stated: "We institute automated portfolio-level risk controls on a daily-basis.…We set hard limits and quantifiable breaks to manage risk at both the portfolio and position level.… We adhere to a strict sell discipline.… We employ several techniques to mitigate risk in our portfolios."

    b. During the Relevant Period, Sanaullah participated in drafting and reviewing the due diligence questionnaire, which discussed the Fund's risk management protocols, and was distributed to investors and prospective investors. The due diligence questionnaire stated:

        i. In response to the question, "What makes your strategy unique?," it states: "An intersection of qualitative and quantitative elements in our process, which allows for a

15

disciplined approach to risk management without preventing

the discovery and application of subjective insights";

    ii.  Under "Risk and portfolio management": "We have min/max

ranges for our risk-adjusted exposures across these, and other,

vectors, and our skews within those ranges reflect our

convictions.  We purchased monthly hedges as a rule";

    iii.  And, "Our Strategist, [Sanaullah], provides oversight over this

risk management, including alerts from our risk models."

44.    Sanaullah disseminated these documents. Sanaullah sent, or directed

others to send, either before or after phone and Zoom calls with investors and

prospective investors, an email attaching the investor presentations and due

diligence questionnaire that contained false and misleading statements about the

Fund's risk management.

45.    A reasonable investor would have understood from these written

statements that the Fund had risk management protocols that were being

implemented and that the Fund's risk was being monitored and controlled by

Sanaullah.

46.    As explained above, these statements concerning risk management

protocols were false and misleading when made because the Fund was not

following the risk management protocols that had been represented to investors

and Sanaullah was not ensuring the risk management protocols were being followed.

47.    The statements to investors and prospective investors about the Fund's risk management protocols were false and misleading when made and Sanaullah knew or was reckless in not knowing, and should have known, that the statements were false and misleading. Sanaullah did not always follow the risk management protocols in his trading for the Fund and from his access to certain trading accounts Sanaullah could see that Middlebrooks was not following the risk protocols represented to investors. As discussed above, Sanaullah discussed the Fund's failure to adhere to the disclosed risk management protocols in chats with Middlebrooks.

48.    The false and misleading statements made to Fund investors and prospective investors concerning the Fund's risk management practices were material because they touch upon one of the most fundamental aspects of the investment, risk analysis, management, and controls. Investors and prospective investors would want to know if the Fund was failing to provide risk management of the Fund's trading decisions and if risk management was not being monitored or deployed as disclosed.

      2.    <u>Sanaullah Disseminated Materials with False and Misleading Statements to Investors About Having Graduated College.</u>

49.    Additionally, Sanaullah participated in drafting and reviewing documents, and disseminated documents, with false and misleading statements concerning his educational background, stating he had a college degree, when he did not.

50.    Sanaullah participated in the drafting and review of investor presentations, performance sheets, and a due diligence questionnaire that were provided to investors and prospective investors that contained false and misleading statements about his education.

     a.  From at least December 2017 through the Relevant Period, quarterly investor presentations stated Sanaullah "received his degree in 2011 from University of Michigan."

     b.  From at least April 2019 through the Relevant Period, performance sheets stated Sanaullah "studied Mathematics at the University of Michigan (B.A. 2011)" or that Sanaullah "received his degree in 2011 from University of Michigan."

     c.  From at least mid-2019 through the Relevant Period, a due diligence questionnaire stated Sanaullah "studied Mathematical Sciences at the University of Michigan, graduating in 2011."

18

51.     Sanaullah disseminated these documents. Sanaullah sent, or directed others to send, either before or after the investor calls, an email attaching the investor presentations, performance sheets, or due diligence questionnaire that contained false and misleading statements about his education.

52.     A reasonable investor would have understood from these statements that Sanaullah had graduated from college and, specifically, received an undergraduate degree from the University of Michigan in Mathematics.

53.     The statements about Sanaullah receiving his degree from the University of Michigan were false and misleading because, while Sanaullah did attend the University of Michigan, he did not graduate or obtain a degree from University of Michigan or any other college.

54.     The statements about Sanaullah in the performance sheets, investor presentations, and due diligence questionnaire were false and misleading when made and Sanaullah knew or was reckless in not knowing, and should have known, that the statements indicating that he received a college degree were false and misleading because he was aware he had not received a degree from any college.

55.     The false and misleading statements Sanaullah made to investors and prospective investors about his degree from the University of Michigan were material because reasonable investors and prospective investors would want to

know about the education of the person responsible for oversight of the Fund's risk

management protocols, including whether that person had graduated from college.

### E.  Payments to Sanaullah from EIA

56.  From August 2019 through August 2021, Sanaullah received

payments from EIA totaling $553,000.

57.  EIA was only able to pay Sanaullah because of the funds obtained

from investors during the Relevant Period.

58.  Sanaullah thus obtained this money through the material

misstatements referenced above, which were made "in the offer or sale" of

securities.

## CLAIMS FOR RELIEF

### First Claim for Relief
### Section 17(a) of the Securities Act

59.  The SEC realleges and incorporates by reference the above

paragraphs 1 through 58 as though fully set forth herein.

60.  Sanaullah, directly or indirectly, in the offer or sale of securities by

the use of means or instruments of transportation or communication in interstate

commerce or by use of the mails, acting with the requisite state of mind:

(a) employed devices, schemes, or artifices to defraud; (b) obtained money or

property by means of untrue statements of a material fact or by omitting to state a

material fact necessary in order to make the statements made, in light of the

circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

61.    By engaging in the conduct described above, Sanaullah violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act. 15 U.S.C. §§ 77q(a).

**Second Claim for Relief**
**Section 10(b) and Rule 10b-5 of the Exchange Act**

62.    The SEC realleges and incorporates by reference above paragraphs 1 through 58 as though fully set forth herein.

63.    Sanaullah, directly or indirectly, in connection with the purchase or sale of a security, and by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, knowingly and recklessly: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

64.    By engaging in the conduct described above, Sanaullah violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the

Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R.

§ 240.10b-5.

## **RELIEF REQUESTED**

**WHEREFORE**, the SEC respectfully requests that this Court:

### **I.**

Find that the Defendant committed the violations alleged in this Complaint;

### **II.**

Enter an injunction, in a form consistent with Rule 65 of the Federal Rules

of Civil Procedure, permanently restraining and enjoining Defendant and his

agents, servants, employees, attorneys, and accountants, and those persons in

active concert or participation with him, who receive actual notice of the Judgment

by personal service or otherwise, and each of them, from engaging in transactions,

acts, practices, and courses of business described herein, and from engaging in

conduct of similar purport and object in violation of Section 17(a) of the Securities

Act, 15 U.S.C. § 77q(a) and Section 10(b) of the Exchange Act, 15 U.S.C. §

78j(b), and Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5, thereunder;

### **III.**

Order Sanaullah to disgorge ill-gotten gains received during the period of

violative conduct and pay prejudgment interest on such ill-gotten gains;

**IV.**

Order Sanaullah to pay a civil money penalty pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d) and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3);

**V.**

Order that Sanaullah be permanently prohibited from acting as an officer and director of any public company; and

**VI.**

Grant such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

The SEC demands a trial by jury on all claims so triable.


Dated:  January 16, 2025                                Respectfully submitted,

                                                By:  *s/ Zachary T. Carlyle*
                                                Zachary T. Carlyle
                                                U.S. Securities and Exchange
                                                Commission
                                                1961 Stout Street, Suite 1700
                                                Denver, CO 80294-1961
                                                Telephone: 303.844.1084 (Carlyle)
                                                Email: carlylez@sec.gov
                                                *Attorneys for Plaintiff*
                                                *U.S. Securities and Exchange*
                                                *Commission*

                                                Local Counsel For Plaintiff
                                                DAWN N. ISON
                                                United States Attorney
                                                Kevin R. Erskine (P69120)
                                                Assistant United States Attorney
                                                U.S. Attorney's Office – Eastern
                                                District of Michigan
                                                211 West Fort Street, Suite 2001
                                                Detroit, Michigan 48226
                                                Telephone: (313) 226-9610
                                                Email: Kevin.Erskine@usdoj.gov